## BOSTON SAND & GRAVEL CO. v. UNITED STATES.

(District Court, D. Massachusetts. December 13, 1926.)

No. 2223.

1. Collision ⟳133—Proceeds of sale of wreck held deductible from value of vessel before collision in ascertaining damages for total loss.

In ascertaining damages as for total loss of vessel in collision, commissioner properly deducted from value of vessel at time of collision amount received from sale of wreck.

2. Collision ⟳141—Owner is not justified in abandoning vessel sunk in collision, if salvage expenses do not exceed her value restored.

It is duty of owner of vessel sunk in collision to minimize loss by making reasonable efforts to salvage vessel, and if expense of raising and restoring will not exceed her value when restored, owner is not justified in abandoning vessel and exacting full compensation for her value.

3. Collision ⟳125—Finding that owner acted with reasonable diligence to prevent total loss before abandoning vessel held warranted.

Finding that owner of vessel sunk in collision acted with reasonable diligence to prevent total loss of vessel before abandoning her to insure company held warranted by evidence.

4. Collision ⟳133—Unsuccessful attempts to induce wrecking companies to salvage vessel warrants finding of constructive total loss.

Unsuccessful attempts by owner and insurer to induce available wrecking companies to undertake salvage of vessel sunk in collision warrants finding of constructive total loss.

5. Collision ⟳133—Measure of damages for total loss of vessel is sum probably obtainable for her before collision. .

Measure of damages for total loss of vessel is sum which probably could have been obtained for her on date of collision as result of fair negotiations between owner willing to sell and purchaser desiring to buy.

6. Collision ⟳150—Commissioner's finding as to damages for total loss of vessel, based on correct rules and adequate evidence, must be confirmed.

Finding of commissioner as to damages for total loss of vessel, based on correct rules, and adequately supported by evidence, must be confirmed.

In Admiralty. Libel by the Boston Sand & Gravel Company against the United States. On libelee's exceptions to report of Commissioner awarding damages for total loss of vessel and libelant's motion to have report confirmed. Report confirmed, and exceptions overruled.

Foye M. Murphy, of Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.

George R. Farnum, Asst. U. S. Atty., of Boston, Mass.

BREWSTER, District Judge. The libel in this cause was brought under special act of Congress (42 Stat. 1590) to recover damages resulting from a collision between the United States destroyer Bell and the steam lighter Cornelia, which occurred August 9, 1918, in Boston Harbor. The Circuit Court of Appeals, on appeal, found both the Bell and the Cornelia at fault, and decreed divided damages. 7 F.(2d) 278. The libel was referred to Fitz-Henry Smith, Jr., Esq., as commissioner, to determine the amount of the damages, and to report thereon to this court. He has fixed the damages at $91,084.68, and reports that the libelant is entitled to recover $45,542.34.

The cause comes before the court upon libelee's exceptions thereto and libelant's motion to have the report confirmed. Libelee assigns numerous grounds upon which it

bases its exceptions. These may be grouped under two heads:

First. Those relating to the finding of the commissioner that the Cornelia was a constructive total loss.

Second. Those relating to the finding of the commissioner that, at the time of the collision, the value of the Cornelia was $95,-000.

In his report the commissioner fully considers the evidence upon which he bases both of these findings. Respecting the finding that the Cornelia was a constructive total loss, it appears that, soon after the collision, the lighter was beached on what is known as "Faun Bar" outside of Deer Island. At high tide her deck was three or four feet under water. The bottom of the harbor at that point was full of boulders of various sizes, some being as large as six or seven feet high. The libelant carried insurance on the vessel, and it abandoned her to the insurance company, which, in turn, sold the wreck as it lay on the bottom for $5,000. The commissioner awarded the damages according to the rule of damages obtaining in cases of total loss, crediting, however, to the value of the vessel at the time of the collision the sum of $5,000 received from the sale of the wreck.

[1] If it could be said that the Cornelia was a total loss, actual or constructive, the measure of damages adopted by the commissioner was the correct one. Smith et al. v. Condry, 1 How. 28, 11 L. Ed. 35; The Ann Caroline, 2 Wall. 538, 17 L. Ed. 833; The Baltimore, 8 Wall. 377, 19 L. Ed. 463; The Reno (C. C. A.) 134 F. 555.

[2] It does not necessarily follow, however, that, because the Cornelia sank as a result of the collision, this rule of damages is to be applied. The Admiralty Law casts upon the owner a duty to exercise reasonable care and attention to minimize the loss. He is required to make reasonable efforts to ascertain whether the vessel can be saved, and if, as a result of such efforts, he finds that it is reasonably possible to salvage her, and that the expense of raising and restoring would not exceed her value when restored, the owner would not be justified in abandoning the vessel and exacting full compensation for her value. The Baltimore, supra; The Reno, supra; The Ernest A. Hamill (D. C.) 100 F. 509; The Havilah (C. C. A.) 50 F. 331.

[3] It is the contention of the libelee that the owner did not exercise the reasonable care and diligence required of it in its endeavors to avoid a total loss.

It appears from the findings of the commissioner, which are abundantly supported by the testimony, that the officers of the libelant company visited the Cornelia on the day of the collision, and, believing that she could be easily floated, they arranged for the patching of the hole in her bow which had been made by the Bell; hired a pump, and on the evening of the same day, at low water, the marine superintendent of libelant undertook to get her afloat. After working two hours, it was found that water was coming in about as fast as it was being pumped out, and further efforts were suspended, to be renewed the following morning.

On the next morning the superintendent found, on arriving at the wreck, that the wind had turned east, and that a sea was running, rendering it impossible to continue his operation. Parts of the afterhouse had been washed away, and it then seemed to the superintendent that the vessel was pulling apart amidships, and, in view of the fact that she was resting upon boulders, he reached the conclusion that she would be damaged to such an extent that the cost of raising and repairing would be more than she would be worth. Furthermore, an agent for the insurance company had investigated, a diver had made an examination of the hull, and had reported unfavorably, appraisers had examined the vessel, with the ultimate result that both the libelant and the insurance company had come to the conclusion that the cost of raising and repairing the vessel would exceed her value when restored. Both the libelant and the insurance company had endeavored to obtain wrecking companies to undertake the raising of the Cornelia, but had not been successful in finding any one to undertake it. The commissioner found that these wrecking companies were the only available concerns that were equipped to do that work.

Thereafter the insurance company sold the Cornelia for $5,000, as above stated. The purchaser had the necessary equipment for raising. His first attempt was not successful, but later, with comparatively little difficulty, he succeeded in getting the Cornelia afloat, and she was towed to a dock in Boston, and, after slight repairs were there made, she was taken to the purchaser's plant in Rockland, Me., where she was completely overhauled at an expense of over $20,000. Two years later she was sold for $60,000. In the light of subsequent events, it is doubtless true that the marine superintendent, the diver, and the appraisers, all of whom advised that the cost of floating and restoring the vessel would exceed her worth when re-

stored, were probably in error, or at least unduly pessimistic, but the evidence ·clearly warrants the commissioner's findings on the question of negligence, which, although stated negatively, I read to import a finding that the libelant, under the circumstances as presented at the time, acted with reasonable diligence in its efforts to prevent a total loss.

[4] Furthermore, the unsuccessful attempts on the part of the libelant and insurance company to induce available wrecking companies to undertake the salvage warrants a finding of constructive total loss. La Normandie (C. C. A.) 58 F. 427; Hughes on Admiralty, p. 327.

[5] As to the amount of damages, the commissioner followed the rule recently laid down in our Supreme Court, and sought to find from all the evidence that value of the vessel· which would be represented by "the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy." Standard Oil Co. v. Southern Pacific Co., 268 U. S. 146, 45 S. Ct. 465, 69 L. Ed. 890.

His report contains an adequate summary of the evidence considered relating to the original cost of the Cornelia; her reproduction value new; the rate of depreciation; contemporaneous sales of similar vessels; costs at that time of constructing other lighters and tugs of approximate similar construction and equipment; the·condition of the market as to supply and demand, and also of the testimony of the owner and experts who had seen the Cornelia, and who gave opinion evidence as to her value.

It is a notorious fact that in the summer of 1918 prices for sea-going craft reached abnormal heights. The court, in Standard Oil Co. v. Southern Pacific Co., supra, took occasion to observe that then the "demand for ships was greater than the supply; the shipyards were working to full capacity; wages and prices were high."

The commissioner in his report says: "I attach great weight under the circumstances of the case to the testimony of the witnesses who knew the Cornelia and the state of the market at the time of the collision.  *  *  * Finally, as the Supreme Court said in the Standard Oil Case, 'value is the thing to be found' and 'is not a matter of formulas' but of 'a reasonable judgment having its basis in a proper consideration of all relevant facts.'  *  *  * I have endeavored to follow the direction of the court, and on all the evidence find that the value of the 'Cornelia' at the time of the collision was $95,-000."

I have carefully examined all the evidence submitted to the commissioner. I do not deem it necessary to review that evidence in this opinion. I am convinced that the evidence abundantly warrants his findings of fact, and that his findings fully justify the conclusion which he has reached respecting the value of the Cornelia at the time of the accident.

[6] Since the commissioner adopted a proper rule of damage, and proceeded along correct lines in determining the extent of that damage, and inasmuch as his conclusions are adequately supported by the evidence, his report must be confirmed, and the libelee's exceptions overruled. I so order, and decrees may be entered accordingly.